1

WARREN LEX LLP
Matthew S. Warren (State Bar No. 230565)
Patrick M. Shields  (State Bar No. 204739)
Erika H. Warren (State Bar No. 295570)
18-2353@cases.warrenlex.com
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

Attorneys for Plaintiffs DealDash Oyj and DealDash Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEALDASH OYJ and DEALDASH INC. <br>       Plaintiffs, <br><br> v. <br><br> CONTEXTLOGIC INC. d/b/a WISH <br>       Defendant. | Case No. 3:18-cv-02353-JCS <br><br> **DEALDASH'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Magistrate Judge:  Hon. Joseph C. Spero <br><br> Date:          June 1, 2018 <br> Time:          9:30 a.m. PDT <br> Location:      Courtroom G |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION…………………………………………………… 1

MEMORANDUM OF POINTS AND AUTHORITIES………………………………... 2

INTRODUCTION……………………………………………………………………… 2

BACKGROUND……………………………………………………………………… 3

    A.    The DealDash Platform Transformed the Traditional Penny Auction by Incorporating Features Often Found in Video Games……………………………………………3

    B.    The DealDash Plaintiffs………………………………………………………… 4

    C.    DealDash's Distinctive Trademark and Branding………………………………... 5

    D.    Wish's Copying of DealDash's Trademarks and Branding…………………………7

    E.    Customer Complaints Regarding Wish…………………………………………… 8

    F.    DealDash Discovers "Deal Dash"……………………………………………… 10

ARGUMENT………………………………………………………………………… 10

I.    DEALDASH IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM FOR TRADEMARK INFRINGEMENT…………………………………………………11

    A.    DealDash Owns an Enforceable Service Mark……………………………………11

    B.    Wish Uses Its Counterfeit Mark in Commerce……………………………………12

    C.    Wish's Misuse of the DealDash Mark Creates a Likelihood of Confusion……………... 12

        1.    Wish's Counterfeit Mark Is Virtually Identical to DealDash's Registered Mark…... 13

        2.    DealDash's Service and Wish's "Deal Dash" Feature Are Closely Related……….. 14

        3.    DealDash and Wish Use Similar Marketing Channels……………………………... 15

        4.    The "DealDash" Mark Is Inherently Distinctive and Entitled to Strong Protection... 16

        5.    A Low Level of Consumer Care Makes Confusion Likely…………………………... 17

        6.    Consumers Are Actually Confused by Wish's Counterfeit Mark………………….. 18

        7.    Wish Deliberately Chose Its Counterfeit Mark to Capitalize on DealDash's Goodwill……………………………………………………………………… 19

        8.    Likelihood of Product Expansion Is Unimportant Because the Parties Already Compete……………………………………………………………………… 21

        9.    Summary of the *Sleekcraft* Factors……………………………………………… 21

II.     DEALDASH WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION…………………………………………………………………………….. 21

III.    THE BALANCE OF EQUITIES FAVORS DEALDASH………………………………….. 22

IV.     A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST…………………….... 23

V.      SCOPE OF THE INJUNCTION………………………………………………………… 23

CONCLUSION…………………………………………………………………………….. 24

## **TABLE OF AUTHORITIES**

### **CASES**

*2Die4Kourt v. Hillair Capital Mgmt., LLC,*
    692 Fed. Appx. 366 (9th Cir. 2017)………………………………………………...21, 22

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)……………………………………………………….. 11

*AMF Inc. v. Sleekcraft Boat,*
    599 F.2d 341 (9th Cir. 1979)………………………………………………... 12, 13, 15

*Bridgestone Brands, LLC v. Dastgah,*
    No. 16-906, 2016 WL 1070670 (N.D. Cal. Mar. 18, 2016)………………………….... 11

*Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.,*
    174 F.3d 1036 (9th Cir. 1999) ………………………………………………….. *passim*

*D.light Design, Inc. v. Boxin Solar Co.,*
    No. 13-5988, 2014 WL 11397885 (N.D. Cal. Apr. 4, 2014)  ………………………………..23

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,*
    109 F.3d 1394 (9th Cir. 1997) ……………………………………………….......23

*Dreamwerks Prod. Group, Inc. v. SKG Studio,*
    142 F.3d 1127 (9th Cir. 1998)......................................................................14, 15, 17, 21

*Ford Motor Co. v. Summit Motor Prods., Inc.,*
    930 F.2d 277 (3d Cir. 1991) …………………………………………………… 17

*Go Daddy Operating Co. v. Ghaznavi,*
    No. 17-6545, 2018 WL 1091257 (N.D. Cal. Feb. 28, 2018) …………………………...………*passim*

*GoTo.com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000) ……………………………………….…….……...… *passim*

*JL Beverage Co. v. Jim Beam Brands Co.,*
    828 F.3d 1098 (9th Cir. 2016) ………………………………...……………….......…...………...17

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.,*
    601 Fed. Appx. 469 (9th Cir. 2015) ………………………………………………....21

*Maxim Integrated Prods., Inc. v. Quintana,*
    654 F. Supp. 2d 1024 (N.D. Cal. 2009) …………………………...…….…………….. *passim*

*Merscorp Holdings, Inc. v. Mers, Inc.,*
    No. 16-cv-04380, 2016 WL 5109969, at *4 (N.D. Cal. Sept. 21, 2016) …………….....……… 18, 22

*Pom Wonderful LLC v. Hubbard,*
    775 F.3d 1118 (9th Cir. 2014) ………………………………….……………….…..... *passim*

*SunEarth, Inc. v. Sun Earth Solar Power Co.*
  846 F. Supp. 2d 1063 (N.D. Cal. 2012) …………………………………………...……………… *passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) …………………………………………………………………………………10

## **STATUTES**

15 U.S.C. § 1114(1)(a) ………………………………………………………………………….... 11

15 U.S.C. § 1115(b) ……………………………………………………………………………… 11

15 U.S.C. § 1127 ……………………………………………………………………………… 12

TABLE OF AUTHORITIES

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 1, 2018, at 9:30 a.m., or as soon thereafter as the matter may be heard in Courtroom G of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs DealDash Oyj and DealDash Inc. will and hereby do move under Federal Rule of Civil Procedure 65 for entry of an order preliminarily enjoining Defendant ContextLogic Inc. d/b/a Wish from using Plaintiffs' "DealDash" service mark, Defendant's counterfeit "Deal Dash" mark, or any other confusingly similar mark, and from taking orders from any Wish app that was originally downloaded with the counterfeit mark, pending a full trial on the merits of this action.

Plaintiffs bring this motion on the grounds that they are likely to succeed on the merits of their claim for trademark infringement of the registered service mark "DealDash," that Plaintiffs are likely to suffer irreparable harm without a preliminary injunction, that the balance of equities favors Plaintiffs, and that a preliminary injunction is in the public interest.

This motion is supported by this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the accompanying Declarations of William Wolfram, Lassi Wessman, Mark Lee, Katerina Yip, and Erika H. Warren; the pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and any further evidence or argument that the Court may receive at or before the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

It is a truism of business that success begets imitation.  But when imitation includes copying a successful trademark and trading on a successful competitor's business reputation, it crosses a line.  That is what happened here:  ContextLogic is using an almost identical counterfeit of DealDash's registered service mark "DealDash" to promote its own business, causing consumer confusion and irreparable harm to DealDash.

Plaintiff DealDash operates one of the most successful and well-known penny auction websites in the United States.  Founded in 2009, DealDash distinguished itself from other auction sites by offering a "gamified" buying experience.  It uses familiar game mechanics like a countdown timer, progress bars, and avatars to increase customer engagement and generate substantial repeat business.  Today, DealDash has over 13 million registered shoppers in the United States and significant brand recognition under its registered service mark "DealDash."

Defendant ContextLogic operates a competing online shopping forum called Wish.  Wish started in 2011 as a wishlist app that allowed users to save a list of their most-wanted products.  By 2015, after Wish had started selling products directly to consumers, what Wish wanted most was a way to boost customer engagement and retention.  Wish found what it wanted—by copying DealDash.  Beginning in 2015, Wish introduced its own gamified shopping experience, a feature it called "Deal Dash."  Wish's "Deal Dash" is a shopping game that uses a countdown timer, animations, and other gaming elements to create a sense of urgency and excitement.  It presents this feature on a screen that announces "Welcome to Deal Dash" in colors that look strikingly like those of the genuine DealDash logo.  Wish's appropriation of the DealDash service mark was blatant but successful:  the "Deal Dash" game greatly increased Wish's sales and customer retention.  Wish has now grown to be one of the largest e-commerce sites in the world, claiming over 300 million users worldwide.

Given its obvious similarity to DealDash's registered mark, it was inevitable that Wish's knockoff "Deal Dash" mark would confuse consumers, and indeed it has.  Among other things, numerous customer complaints about Wish's "Deal Dash" feature have been misdirected to the real DealDash, showing a real and ongoing harm to DealDash's established business reputation.

A preliminary injunction is necessary and appropriate to prevent further irreparable harm to DealDash's business pending resolution of DealDash's claims. DealDash is likely to prevail, at a minimum, on its claim for infringement of the "DealDash" mark, based on Wish's use of a nearly identical mark in a similar business. Without an injunction, DealDash will continue to suffer from loss of control of its business reputation and goodwill, as consumers mistakenly assume that Wish's "Deal Dash" feature is affiliated with DealDash. Because of the substantial likelihood of irreparable harm to DealDash, and of further consumer confusion, the balance of equities and the public interest also favor an injunction.

## BACKGROUND

### A.     The DealDash Platform Transformed the Traditional Penny Auction by Incorporating Features Often Found in Video Games

DealDash is a popular gamified shopping platform available on the Internet and mobile applications. DealDash offers what are generally known as "penny auctions," in which the price of each item starts at just one cent, and rises by one cent with each additional bid. *How it works*, DealDash, https://www.dealdash.com/help/how-it-works (last visited April 18, 2018). After each bid, shoppers have ten seconds to place an additional bid, paying a small "bid fee" to do so. *Id*. When ten seconds elapse without a new bid, the last bidder wins the auction and can purchase the product for the penny-incremented price. *Id*. Bidding requires strategy to win auctions for the lowest possible total cost of price plus bid fees. Declaration of Erika H. Warren, filed concurrently ("Warren Decl."), Ex. 24, 25. DealDash thus turns shopping into a game, in which each shopper competes to purchase the most items for the least money. *Id.*, Ex. 25.

In a traditional penny auction, non-winning bidders get nothing, and they lose their nonrefundable bid fees. DealDash, however, allows all shoppers who bid on an item to purchase that item at the "buy it now" price; if they do so, they receive credits back for their bid fees, to reuse in future auctions. *How to bid in an auction*, DealDash, https://www.dealdash.com/help/auction (last visited April 18, 2018). By giving shoppers the "buy it now" option, according to a 2012 article in The Huffington Post, "DealDash became known as the fair and honest, risk-free alternative to penny auctions." Warren Decl., Ex. 25.

DealDash also "gamifies" the shopping experience in other ways. For example, DealDash rewards shoppers for the time they spend as the highest bidder, by giving them free bids and increasing their

"level," which in turn leads to more free bids.  *How to bid in an action*, DealDash, https://www.dealdash.com/help/auction (last visited April 18, 2018.).  Similarly, DealDash provides badges recognizing particular achievements within its platform such as the "In My Humble Opinion" badge for writing a product review, and the "Chef" badge for winning five auctions in the Kitchen and Dining category.  Warren Decl., Ex. 26.

    For all these reasons, DealDash appeals to competitive, fast-paced and deal-minded shoppers who enjoy the feeling of a "win."  And there are many of these:  more than than 4 million Android users and 1 million iOS users have installed DealDash's apps.  Declaration of Lassi Wessman, filed concurrently ("Wessman Decl."), ¶ 8.  Users have given DealDash and its apps thousands of user reviews, including more than 19,000 five-star reviews and an overall rating of 4.2 on the Google Play Store.  Warren Decl., Ex. 27.

**B.    The DealDash Plaintiffs**

    The DealDash platform belongs to the plaintiffs in this action, DealDash, Inc. and DealDash Oyj (collectively, "DealDash").  DealDash, Inc. is a Delaware corporation based in Minneapolis, Minnesota. Declaration of William Wolfram, filed concurrently ("Wolfram Decl."), ¶ 2.  Its parent company, DealDash Oyj, is a Finnish corporation based in Helsinki, Finland.  *Id.*  DealDash was founded in 2009 by 16-year-old entrepreneur William Wolfram.  In 2013, Mr. Wolfram won the Ernst & Young Entrepreneur of the Year Award and was the youngest national winner to compete for the World Entrepreneur of the Year.  DealDash is now one of the largest and longest-running auction websites in the United States. Warren Decl., Exs. 25, 28.

    DealDash prides itself on excellent customer service, which it considers a key aspect of its business.  "Our excellent customer service is what sets us apart from other online auction companies. DealDash provides 24/7 customer support via email, live chat, and telephone."  *Id.,* Ex. 28.  DealDash has earned an A+ rating from the Better Business Bureau based on over 200 customer reviews.  *Id.*, Ex. 68. Many customers have reported their positive experiences with DealDash's stellar customer service team. *Id.* ("Great prices, Outstanding customer service.  If you have any issues or questions, they get back to you right away and fix any issues Asap.  Love using dealdash site!"; "the best auction site i've ever joined..great customer service plus fast shipment of items i've won..??"; "I asked for a refund on my bid

pack and it was done just like that they were very helpful.").  DealDash spends time, effort, and money on good customer service because DealDash values its reputation with consumers and in the industry. Although it is always useful for retailers to have good customer relations, it is especially useful for DealDash, which gets over 90% of its sales from repeat customers.  Wessman Decl., ¶ 8.

### C.   DealDash's Distinctive Trademark and Branding

To attract and retain those repeat customers, DealDash employs a distinctive trademark and branding strategy.  DealDash first used the "DealDash" mark in commerce on April 1, 2010.  Wolfram Decl., Ex. 1.  On June 18, 2010, DealDash filed a standard character mark for the word "DealDash" with the United States Patent and Trademark Office.  *Id.*  The PTO published this mark for opposition on November 10, 2010, and, on February 1, 2011, registered it as no. 3914068 for "online retail store services featuring a wide variety of consumer goods of others."  *Id.*; Warren Decl., Ex. 30.  The mark became incontestable on August 1, 2017.  *Id.*  The registered mark is owned by plaintiff DealDash Oyj.  Wolfram Decl., Ex. 3.  According to the PTO's TESS system, DealDash holds the only live trademark using both "Deal" and "Dash"; no other marks come close to this word combination.  Warren Decl., Ex. 31.

Since 2010, DealDash used this mark in commerce shown in whimsical, slightly slanted letters using a gold-and-light-yellow color scheme:



Wolfram Decl., Ex. 4.  In 2013, DealDash introduced a new version of its logo, keeping the gold-and-light-yellow color scheme:



*Id.*, Ex. 5.  These colors also appear the DealDash website and app, including on the "Bid Now" button, and are heavily featured in DealDash advertisements and marketing materials:

 

*Id*., Ex. 5, 7.

     Beginning in 2013, the DealDash's television advertising and mobile application added blue to the color scheme:

 

*Id*., Exs. 8, 9.  The DealDash mobile app icon is similarly blue, with the letter "D" presented in the familiar gold and light yellow:



*Id*., Ex. 6.

     DealDash's branding and promotion efforts have been effective.  In 2017, DealDash used an independent company to ask samples of 1,000 consumers which brands they were familiar with; 8.7% of the respondents said they were familiar with DealDash, impressive compared to 11.7% for the much larger Wish.com, 26.5% for Zappos and 31.9% for Etsy.  Declaration of Katerina Yip, filed concurrently ("Yip

Decl."), ¶¶ 3-8 & Exs. 22, 23.

**D.      Wish's Copying of DealDash's Trademarks and Branding**

Defendant ContextLogic, Inc. owns and operates a DealDash competitor called Wish.com ("Wish").  Like DealDash, Wish is an internet and mobile-app-based shopping platform, with apps that appear in the "Shopping" category of the Google and Apple app stores.  Like DealDash's app, the Wish app appears in the top results when users search on "DealDash" or "Deal Dash" in both app stores. Warren Decl., Ex. 32.  Like DealDash, Wish sells a wide array of consumer products, although many of Wish's products are offered exclusively from Chinese manufacturers.  *Id*., Ex. 33.  Like DealDash, Wish attracts fast-paced, deal-minded shoppers.  *Id*.  Like DealDash, Wish seeks to gamify the shopping experience—using a feature called "Deal Dash."  *Id*., Ex. 34.

Wish first introduced its "Deal Dash" feature in approximately 2015.  Wish's website and mobile applications advertise the "Deal Dash" feature using DealDash's traditional blue, yellow and gold colors in addition to its service mark:



*Id*., Ex. 35.  According to its designer, "Deal Dash is a feature within Wish that gamifies the shopping experience by allowing shoppers to play and redeem rewards as they shop."  *Id*., Ex. 34.  To play Wish's "Deal Dash" game, a shopper spins the spinner, which unlocks the indicated number of discounted products.  *Id*., Exs. 34, 35.  The shopper then gets a timed shopping spree where they can buy these discounted products.  *Id*.  The time remaining in the shopping spree is displayed as a countdown timer; the

minutes remaining appear in a banner using the familiar gold and blue:



*Id*. Shoppers can use the "Deal Dash" feature once per day. *Id*.

Online reviews state that Wish's "Deal Dash" game increases user engagement: "This feature encourages habit and I have to admit it made me scroll and browse products that bit quicker, looking for something right for me." *Id*., Ex. 36. As it does for DealDash, gamifying shopping works for Wish: it has received substantial venture capital backing, and hundreds of millions of users have downloaded Wish's infringing mobile apps. *Id*., Ex. 37.

### E. Customer Complaints Regarding Wish

While the "Deal Dash" game has helped make Wish into an extremely successful e-commerce platform, that success has not come without controversy. Wish has received thousands of customer complaints about merchandise shoppers purchased on its platform. Warren Decl., Ex. 38. Shoppers complain that items they purchased on Wish are never delivered, and their money never refunded. *Id*., Exs. 38, 39. Shoppers also complain that Wish merchandise is of poor quality and the items received often differ from the images on Wish's website. *Id*. Others complain that they became victims of credit card scams by using the Wish site. *Id*., Ex. 39. Based on these and other issues, Wish has over 2,000

reviews and a two-star rating on the review site "pissedconsumer.com." *Id.*, Ex. 38. According to a January 2016 consumer news article:

> On ComplaintsBoard, there were dozens of customer complaints about Wish.com, including unauthorized transactions soon after placing an order, poor quality products (especially related to electronics), long shipping times (as you can see from the picture above, it could take a month or more to arrive), difficulty obtaining a refund, and poor customer service.
>
> Wish.com, based out of San Francisco, CA, also had an F rating with the Better Business Bureau at the time of our research, based on 245 closed complaints (as of 1/12/16). Nearly all of these appeared to reference difficulty obtaining refunds, and the company's tendency to continuously send automated email responses to very specific requests). On top of this, there were still 72 complaints that the company never bothered responding to.

*Id.*, Ex. 40.

Shoppers' complaints regarding the nature and quality of Wish products appear well-founded: a search of the Wish platform reveals that many of the products sold on Wish are at best cheap knockoffs. For example, a search for "Apple Watch" turns up dozens of fakes designed to look like the real thing:



*Id.*, Ex. 41. Wish sellers use product descriptions including "Apple" and "IOS" to ensure their fakes will turn up when shoppers search for an Apple Watch. Some even use a seemingly counterfeit Apple logo in the product image:



*Id.*, Ex. 41.  Similar searches for a wide variety of name brand goods show that Wish products are, for the most part, knockoffs.  *See id.*, Exs. 42 ("Fitbit"), 43 ("LEGO Architecture"), 44 ("Louis Vuitton").  It is thus unsurprising that so many shoppers have pegged Wish products "fake" and the site, overall, a "scam." *Id.*, Ex. 39 ("Buyer beware!" and "WISH.COM IS A SCAM!!!"); *id.*, Ex. 45 ("Mostly Fake or Counterfeit Junk with High Shipping Costs").

### F.      DealDash Discovers "Deal Dash"

In late August 2017, a friend who had seen Wish's "Deal Dash" feature reached out to Mr. Wolfram to ask about DealDash's relationship with Wish.  Wolfram Decl., ¶ 12.  At that point, Mr. Wolfram had only a passing familiarity with Wish and he was not aware Wish was using DealDash's service mark.  *Id.*  When Mr. Wolfram and DealDash investigated, they were shocked to find "Welcome to Deal Dash" prominently displayed on Wish's app and website.  *Id.*, ¶ 13.  Subsequent investigation revealed that DealDash customer service had in fact already received a number of complaints from customers who were actually using Wish, but thought it was affiliated with DealDash.  Declaration of Mark Lee, filed concurrently ("Lee Decl."), ¶¶ 4-6 & Exs. 10-21.  In late October 2017, DealDash began looking for litigation counsel to protect its rights.  Wolfram Decl., ¶ 15.  This lawsuit and this motion followed.

### ARGUMENT

"A plaintiff seeking a preliminary injunction can satisfy either of two tests.  His first option is to establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Go Daddy Operating Co. v. Ghaznavi*, No. 17-6545, 2018 WL 1091257, at *12 (N.D. Cal. Feb. 28, 2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "Alternatively, the plaintiff's second option is to show that (1) serious questions going to the merits were raised; (2) the balance of hardships tips sharply in the plaintiff's favor; (3) there is a likelihood of irreparable injury; and

(4) the injunction is in the public interest." *Id*. (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)) (internal quotation marks omitted).  "A 'serious question' is one on which the plaintiff has a fair chance of success on the merits."  *Id*.

When considering a plaintiff's showing on the likelihood of success and irreparable harm, courts employ a "sliding scale."  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1073 (N.D. Cal. 2012).  "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Id*. (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1131) (internal quotation marks omitted).

In this case, DealDash easily satisfies either test.

## I.   DEALDASH IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM FOR TRADEMARK INFRINGEMENT

"To prevail on its trademark infringement action, a plaintiff must demonstrate (1) ownership of an enforceable right in a trademark and (2) that defendant's use of the mark creates a likelihood of consumer confusion."  *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1031 (N.D. Cal. 2009); *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (same).  The plaintiff must also show the defendant uses its counterfeit mark "in commerce."  *Go Daddy*, 2018 WL 1091257, at *6; 15 U.S.C. § 1114(1)(a).  Even at this early stage, the evidence amply supports each element.

### A.   DealDash Owns an Enforceable Service Mark

"Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration."  *Pom Wonderful*, 775 F.3d at 1124; *see also Bridgestone Brands, LLC v. Dastgah*, No. 16-906, 2016 WL 1070670, at *3 (N.D. Cal. Mar. 18, 2016); 15 U.S.C. § 1115(b).

DealDash owns the federal trademark registration for the "DealDash" service mark, in connection with "[o]n-line retail store services."  Wolfram Decl., Exs. 1, 3.  The "DealDash" mark is a standard character mark, *id*., meaning it covers any use of the mark "in all types of depictions," regardless of font style, color, or other variations of display.  *Pom Wonderful*, 775 F.3d at 1125.  The registration issued in February 2011, and has become incontestable.  *Id*., Ex. 1; Warren Decl., Ex. 30.  DealDash therefore satisfies the first element of its trademark infringement claim.

**B.** **Wish Uses Its Counterfeit Mark in Commerce**

Use in commerce "typically occurs when a mark is used in conjunction with the actual sale of goods or services." *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999).  This includes "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce."  15 U.S.C. § 1127.

Wish unquestionably uses its counterfeit mark "Deal Dash" in commerce.  It prominently displays the words "Welcome to Deal Dash" in the Wish app itself, on Wish.com, and in advertisements.  Warren Decl., Ex. 35.  Wish uses the "Deal Dash" feature to sell goods on those platforms.  That is more than sufficient.

**C.** **Wish's Misuse of the DealDash Mark Creates a Likelihood of Confusion**

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield*, 174 F.3d at 1053; *see also SunEarth*, 846 F. Supp. 2d at 1076 ("[T]he relevant inquiry is into source confusion.").

To assess the likelihood of confusion, courts in this Circuit look to the following eight factors, known as the *Sleekcraft* factors:  "(1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion." *Pom Wonderful*, 775 F.3d at 1125 (citing *AMF Inc. v. Sleekcraft Boat*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

The *Sleekcraft* test is a "pliant" one, in which "some factors are much more important than others." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *see also SunEarth*, 846 F. Supp. 2d at 1076 ("[T]he analysis is not to be considered in a mechanical fashion, and instead the importance of each *Sleekcraft* factor will vary in each particular case.").

When the marks at issue are used on the Internet, the similarity of the marks, the relatedness of the goods or services, and the simultaneous use of the Web as a marketing channel are often found to be the most important factors.  *See GoTo.com,* 202 F.3d at 1205; *Brookfield*, 174 F.3d at 1054 n.16.  Courts

sometimes call these three factors "the controlling troika." *SunEarth*, 846 F. Supp. 2d at 1076.

In this case, the first seven *Sleekcraft* factors clearly favor DealDash and therefore support an injunction, and the last factor is neutral. Considered together, these factors demonstrate that DealDash is likely to succeed in proving that Wish's counterfeit mark will likely confuse consumers.

**1. Wish's Counterfeit Mark Is Virtually Identical to DealDash's Registered Mark**

The similarity of the marks is always an important factor because "the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com,* 202 F.3d at 1206; *see also Brookfield*, 174 F.3d at 1054. "[L]ess similarity between the marks will suffice when the goods are complementary, . . . the products are sold to the same class of purchasers, . . . or the goods are similar in use and function." *SunEarth*, 846 F. Supp. 2d at 1077 (quoting *Sleekcraft*, 599 F.2d at 350) (alterations in original). The Ninth Circuit has prescribed the following axioms that guide the similarity analysis: "(1) similarity is best evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and as they appear in the marketplace; and (3) similarities weigh more heavily than differences." *Pom Wonderful*, 775 F.3d at 1127–28.

DealDash's registered mark "DealDash" and Wish's counterfeit mark "Deal Dash" are virtually identical in appearance, sound, and meaning. Both employ the same words, the same spelling, and the same capitalization. Spoken aloud, they are indistinguishable. *Cf. Sleekcraft*, 599 F.2d at 351 ("Sound is also important because reputation is often conveyed word-of-mouth."). Although neither has a literal meaning, to the extent the words suggest transactions with an element of speed, they do so equally.

The way Wish displays its counterfeit mark adds to the confusion because it incorporates part of DealDash's trade dress.[1] The DealDash mark is most commonly shown in a two-tone font of gold and lighter yellow. Wish's "Deal Dash" feature displays the words "Welcome to Deal Dash" against a two-tone background of strikingly similar gold and lighter yellow:

---

[1] Because the Court reviews the similarity of the marks as they appear in the marketplace, it is appropriate to consider the products' respective trade dress, even if trade dress infringement is not at issue. *See Pom Wonderful*, 775 F.3d at 1128 n.7.



The only difference between the two marks is that Wish's counterfeit mark includes a space between "Deal" and "Dash."  That one trivial difference is hardly likely to alert customers that the "Deal Dash" feature is not affiliated with DealDash, especially given that, in everyday usage outside the trademark context, those words would generally have a space between them.  As shown above, DealDash also often displays its service mark on two lines, making the absence of a space impossible to see.  Indeed, some of DealDash's customer reviews (the real ones, not the ones about Wish) refer to DealDash as "Deal Dash," indicating customers are, unsurprisingly, not focused on the presence or absence of a space. Warren Decl., Ex. 68.

In sum, similarities between these two marks far outweigh the differences.  This factor therefore weighs strongly in favor of DealDash.  *Cf. Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) (finding confusing similarity between "Dreamwerks" and "DreamWorks," noting "[w]hile we recognize that spelling matters, we're not sure substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks"); *SunEarth*, 846 F. Supp. 2d at 1078 (finding confusing similarity between "SunEarth" and "Sun-Earth" because "within the text, both marks have similar capitalizations within the lettering, though Defendants use a hyphen and Plaintiffs do not, and both words sound identical when spoken aloud").

## 2.   DealDash's Service and Wish's "Deal Dash" Feature Are Closely Related

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Maxim*, 654 F. Supp. 2d at 1032.  "Related goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the same

mark." *Pom Wonderful*, 775 F.3d at 1127.  To be related, the parties need not be direct competitors.  *See id*.  Moreover, "the relatedness of each company's prime directive isn't relevant." *Dreamwerks*, 142 F.3d at 1131.  "The proximity of goods is measured by whether the products are:  (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *SunEarth*, 846 F. Supp. 2d at 1077 (citing *Sleekcraft*, 599 F.2d at 350).

In this case, although the DealDash service and Wish's "Deal Dash" feature use somewhat different sale mechanics, they serve closely related and largely overlapping markets.  Both target cost-conscious customers who are looking to buy discounted consumer goods through a gamified shopping experience.  DealDash delivers this experience through a gamified penny auction; "Deal Dash" delivers it through a gamified discount wheel; but the use and function of these services are largely same.

There is also significant overlap in the types of goods consumers actually purchase through these services.  Both DealDash and Wish offer consumer electronics, apparel and accessories, luggage, toys and games, and health and beauty items.  In many cases both DealDash and Wish offer shoppers the exact same goods:  for example, a shopper on either site can purchase a Canon DSLR camera lens (Warren Decl., Exs. 46, 47), an Apple iPad (*id.*, Exs. 48, 49), Judith Leiber "Amethyst" and "Night" Perfumes (*id.*, Exs. 50, 51), a Sony PlayStation game controller (*id.*, Exs. 52, 53), or a Conair Infiniti hair dryer (*id.*, Exs. 54, 55).  Because DealDash and Wish offer largely similar services to largely the same customers, Wish's counterfeit mark creates a high likelihood of consumer confusion.  *See GoTo.com*, 202 F.3d at 1206 ("[W]e can safely conclude that the use of remarkably similar trademarks on different web sites creates a likelihood of confusion amongst Web users.").

### 3.    DealDash and Wish Use Similar Marketing Channels

"The use of 'convergent marketing channels' increases the likelihood of consumer confusion." *Maxim*, 654 F. Supp. 2d at 1032.  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130.

In this case, both DealDash and Wish's "Deal Dash" feature are Internet- and app-based services.  Both use digital and social media—such as Facebook and Instagram—as primary advertising channels.

*See* Wessman Decl., ¶ 3; Warren Decl., Ex. 56 (reporting that Wish spends around $100M per year on Facebook advertising).  Furthermore, when consumers search for "DealDash" in Google Play or Apple's App Store, Wish comes up in the search results.  *Id.*, Ex. 32.

"[T]he [Internet], as a marketing channel, is particularly susceptible to a likelihood of confusion since . . . it allows for competing marks to be encountered at the same time, on the same screen."  *Maxim*, 654 F. Supp. 2d at 1032 (quoting *GoTo.com*, 202 F.3d at 1207) (alterations in original); *see also Brookfield*, 174 F.3d at 1057 ("West Coast and Brookfield both utilize the Web as a marketing and advertising facility, a factor that courts have consistently recognized as exacerbating the likelihood of confusion.").  The convergence of Internet marketing channels in this case clearly favors DealDash.[2]

### 4.     The "DealDash" Mark Is Inherently Distinctive and Entitled to Strong Protection

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws."  *Brookfield*, 174 F.3d at 1058.  "This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength."  *GoTo.com*, 202 F.3d at 1207.

In terms of conceptual strength, "[m]arks can be conceptionally classified along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful."  *Brookfield*, 174 F.3d at 1058.  The "DealDash" mark is at least suggestive and therefore inherently distinctive.  "If a mark requires a consumer to use more than a small amount of imagination to form an association between the mark and the product, then the mark is suggestive and not descriptive."  *Maxim*, 654 F. Supp. 2d at 1033; *see also Brookfield*, 174 F.3d at 1058 ("Brookfield's trademark is not descriptive because it does not describe either the software product or its purpose.").  The "DealDash" mark does not describe the functionality of DealDash's service.  At most, it suggests some type of commercial transaction ("deal") associated with some element of speed ("dash"); but significant imagination is

---

[2] In 2017, both DealDash and Wish also used extensive cable television advertising, on many of the same networks (including Bravo, E!, FOOD, Galavision, HGTV, MTV, Nick at Nite, OWN, Oxygn, TBS, TNT, Travel, and USA).  Wessman Decl., ¶ 4.

required to connect those general concepts to DealDash's specific gamified penny-auction shopping experience.

Commercial strength is based on actual marketplace recognition.  *See JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016).  Thus, advertising expenditures, length of use, and public recognition can all strengthen a mark.  *See Pom Wonderful*, 775 F.3d at 1126; *see also Maxim*, 654 F. Supp. 2d at 1033 (finding commercial strength of mark weighed in plaintiff's favor, where plaintiff used its mark for nearly ten years and spent more than two million dollars in advertising).

DealDash has used its service mark in commerce since 2010.  Wolfram Decl., ¶ 6 & Ex. 4.  Since its launch, DealDash has spent over ███████ on branding and advertising.  Wessman Decl., ¶ 5.  This includes both advertising over digital and social media, as well as national television advertising on cable channels.  *Id.*, ¶¶ 3-4.  And DealDash's efforts to promote brand awareness have been successful. DealDash is recognized as one of the best, largest, and longest-running auction websites in the United States.  Warren Decl., Exs. 25, 28.  An informal third-party survey of 1,155 people showed that 8.7% of respondents were familiar with the DealDash brand, far more than many other online retailers.  Yip Decl., ¶¶ 5-6, Ex. 22.  This evidence shows the "DealDash" mark has acquired secondary meaning.  Because the "DealDash" mark is strong both conceptually and commercially, this factor weighs in favor of DealDash.

### 5. A Low Level of Consumer Care Makes Confusion Likely

"Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.'" *Brookfield*, 174 F.3d at 1060 (quoting *Dreamwerks*, 142 F.3d at 1129); *see also Maxim*, 654 F. Supp. 2d at 1034 ("Courts look to what the reasonably prudent purchaser, using ordinary caution, would do to distinguish between the two product lines.").  "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely."  *Brookfield*, 174 F.3d at 1060.  Where the level of care across the class of customers is mixed, the Ninth Circuit has endorsed the rule of thumb that "the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer."  *GoTo.com*, 202 F.3d at 1209 (quoting *Ford Motor Co. v. Summit Motor Prods.*, *Inc.*, 930 F.2d 277, 293 (3d Cir. 1991)).

In this case, both DealDash and Wish cater to customers buying discounted consumer goods.  The goods themselves vary in value, but the range includes a variety of inexpensive products such as

children's' toys and dolls, smartphone accessories, and DVDs.  Warren Decl., Exs. 57, 58.  Consumers buying products in this price range are likely to exercise a low degree of care.  *See Maxim*, 654 F. Supp. 2d at 1035 (finding that "an ordinary consumer is likely to exercise a low degree of care" in distinguishing between products that cost close to $50).

DealDash and Wish are also Internet-based services.  The Internet is not renowned for its high level of user care.  *See GoTo.com*, 202 F.3d at 1209 ("Although the use of computers may once have been the exclusive domain of an elite intelligentsia, even modern-day Luddites are now capable of navigating cyberspace. . . . [A]rguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing.").  At a minimum, the Internet attracts all kinds, including the relatively unsophisticated.  The "least sophisticated consumer" in this medium is therefore highly likely to be confused by similar service marks.[3]

### 6.   Consumers Are Actually Confused by Wish's Counterfeit Mark

"Evidence of past actual confusion is persuasive proof that future confusion is likely in a trademark infringement lawsuit."  *Maxim*, 654 F. Supp. 2d at 1035 (citing *GoTo.com*, 202 F.3d at 1208); *see also SunEarth*, 846 F. Supp. 2d at 1079 (same).

Although DealDash's investigation of consumer confusion is ongoing, it has already discovered numerous instances of customer confusion regarding Wish's counterfeit "Deal Dash" mark.  Support tickets from DealDash's customer service center reflect complaints about Wish that customers misdirected to DealDash.  Lee Decl., ¶¶ 4-5 & Exs. 10-21.  For example, one customer emailed DealDash customer service asking:

> Why was I charged $72 on PayPal and also charged for 2 more purchases on my Mastercard totaling almost $72.  I want you to remove the $72 PayPal charge.  Also the charges on my MasterCard are incotrect [sic] . . . I cancelled several items.  I don't think I should do Dealdash anymote [sic].  I don't know what I am doing Please help me.

*Id.*, Ex. 18.  When DealDash customer support indicated it had no record of some of the transactions the customer was concerned about, the customer replied:

---

[3] In addition, evidence of actual consumer confusion, *see infra*, suggests a low degree of care.  *See Merscorp Holdings, Inc. v. Mers, Inc.*, No. 16-cv-04380, 2016 WL 5109969, at *4 (N.D. Cal. Sept. 21, 2016).

> I HAVE WISH AND DEALDASH CONFUSED!  I HAVE CHARGES I CANT JUSTIFY.
> PLEASE HELP ME NOW!

*Id.* (all caps in original).  Another customer complained:

> You have a daily spin of which I won some type of cream and a phone.  It said to pay the
> $4.95 shipping for the cream and then it would go back to order the phone.  I was shocked to
> see that they placed an order for almost $40 on my debit card and never returned for the
> phone.  It would not let me contact them again.

*Id.*, Ex. 16.  Customer support responded that DealDash does not have a "daily spin" and suggested the

customer must have been on a different website.  The customer replied:

> Then you should look into this because it comes up every so often when I am on your site
> and it specifically says Deal Dash.  Maybe it is fraud or some kind of scam going on with
> your name.

*Id.*; *see also* Warren Decl., Ex. 59 ("Representative:  I received the email and it looks like the email is

actually not from Deal Dash.  It is from Wish.com.  Caller Luis:  Oh, that's not Deal Dash? . . . I thought

they were the same."); *id.*, Ex. 60 ("Representative:  This was something you ordered through a Deal Dash

account?  Caller Mary:  Yes. . . . It was WishDealDash.com."); *id.*, Ex. 61 ("Caller Robert:  The website

on my phone is a blue square with a 'W' in it.  But when I ordered it, it said Deal Dash."); *id.*, Ex. 62

("Caller William:  I tried to buy something yesterday on DealDash, but it keeps coming up Wish. . . . I

don't know what Wish is.").

These examples show not only that customers are confusing Wish's knockoff "Deal Dash" feature

with the real DealDash, but also that problems those customers encounter with Wish are negatively

affecting their opinion of DealDash.  Accordingly, this factor favors DealDash.  *See SunEarth*, 846 F.

Supp. 2d at 1079 ("Because Plaintiffs have proffered some evidence at this early stage of the proceedings,

this factor favors them.").

### 7.    Wish Deliberately Chose Its Counterfeit Mark to Capitalize on DealDash's Goodwill

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge,

actual or constructive, that it was another's trademark."  *SunEarth*, 846 F. Supp. 2d at 1080 (quoting

*Brookfield*, 174 F.3d at 1059) (internal quotation marks omitted).  "Where a defendant knowingly adopts a

mark similar to another's, the court may presume an intent to deceive consumers." *Maxim*, 654 F. Supp. 2d at 1033.

Although DealDash has not yet had a chance to take discovery, even publicly available information suggests that Wish deliberately chose that mark to take advantage of DealDash's established business reputation and goodwill.

Jennifer Huynh is a product designer for Wish who claims to be personally responsible for the design of Wish's "Deal Dash" feature. Warren Decl., Ex. 64.[4]  On her personal website (which repeatedly uses the counterfeit "Deal Dash" mark), she describes "Deal Dash" in terms that are strikingly similar to DealDash's own branding. *Id.*, Ex. 34.  For example, Ms. Huynh describes the goal of "Deal Dash" as: "Increase retention by leveraging a shopper's sense of urgency and excitement by gamifying the shopping experience." *Id*.  Ms. Huynh describes the approach of "Deal Dash" by asking "What if we adapted this concept of gaming to shopping?" *Id*.  She explains:  "Colors and animations provided delight, timed events created excitement and a sense of urgency, and rewards and points positively conditioned gamers." *Id*.  Ms. Huynh notes that, after adopting these "gamifying" features, "[t]he outcome included a **boost in engagement and retention**.  More shoppers were interacting and coming back to take part in Deal Dash. . . . contributing to an **increase in sales**." *Id*.  (emphasis in original).

Ms. Huynh's description of Wish's "Deal Dash" sounds remarkably similar to Deal Dash's well-publicized model of "turning shopping into a game."  Warren Decl., Ex. 25; *see also id*., Ex. 65 ("[Wolfram] added game mechanics to the site to keep people coming back and to stay engaged for longer"); Ex. 66 ("It's almost like strategy gaming in the world of e-commerce.").

Given DealDash's widespread level of consumer and industry recognition, the fact that DealDash and Wish operate in closely related commercial spaces, and the striking similarity of the language Wish uses to describe its knockoff service, it is highly unlikely this similarity is coincidental.  The Court can infer from this evidence that Wish deliberately copied DealDash's successful mark (and other features) to capitalize on its established goodwill and confuse consumers.

---

[4] Before taking discovery, the evidence from Ms. Huynh's website is, admittedly, hearsay. However, the Court can consider hearsay because the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings.  *See Go Daddy*, 2018 WL 1091257, at *14.

**8.**     **Likelihood of Product Expansion Is Unimportant Because the Parties Already Compete**

"[W]here two companies already compete in the same product line to a significant degree, the expansion factor becomes relatively unimportant."  *Maxim*, 654 F. Supp. 2d at 1034 (citing *Brookfield*, 174 F.3d at 1060; *GoTo.com*, 202 F.3d at 1209).  In this case, as discussed above, DealDash and "Deal Dash" already compete for the same customers to a significant degree.  This factor is therefore no worse than neutral.

**9.**     **Summary of the *Sleekcraft* Factors**

In sum, seven of the eight *Sleekcraft* factors—including all three of the "controlling troika"—favor DealDash, and the last factor is neutral.  While the *Sleekcraft* analysis requires more than just a rote weighing of factors, *see Dreamwerks*, 142 F.3d at 1129 ("[W]e do not count beans."), here those factors overwhelmingly indicate a likelihood of confusion.  DealDash has therefore shown a high probability of success on the merits of its claim for trademark infringement.

## II.     DEALDASH WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

"In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill."  *Maxim*, 654 F. Supp. 2d at 1035; *see also Go Daddy*, 2018 WL 1091257, at *13 ("Reputational harm and loss of goodwill can constitute irreparable harm.").  Where a defendant's goods or services are likely to be confused with plaintiff's, the trademark holder loses the ability to control its own reputation and goodwill.  *See, e.g., SunEarth*, 846 F. Supp. 2d at 1083; *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 Fed. Appx. 366, 369 (9th Cir. 2017).

In particular, evidence that customer confusion has led to misdirected complaints about the defendant's infringing product is powerful evidence that irreparable harm to reputation and goodwill is likely.  *See Go Daddy*, 2018 WL 1091257, at *13 ("In the Ninth Circuit, an employee declaration 'reporting numerous and persistent complaints from would-be customers who received robo-calls for what they believed were [plaintiff's] products' and 'emails and social media posts from consumers' is sufficient to support a finding of a threat to plaintiff's 'reputation and goodwill.'" (quoting *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 Fed. Appx. 469, 473–74 (9th Cir. 2015))).  Similarly, customer

complaints that refer to the defendant's product using the plaintiff's trademark also show harm to the plaintiff's reputation.  *See Maxim*, 654 F. Supp. 2d at 1036.

In this case, substantial evidence shows that Wish's counterfeit mark has already harmed DealDash, and is likely to cause further harm without an injunction.  As shown above, consumers are directing complaints to DealDash about Wish's knockoff "Deal Dash" feature, showing a direct impact on DealDash's business reputation.  Lee Decl., ¶¶ 4-5, Exs. 10-21.  Other consumers who have had negative experiences with the counterfeit "Deal Dash" correctly direct their complaints to Wish, but do so by naming "Deal Dash" as the source of their problems.  Warren Decl., Ex. 67.  Given the near identicality of the marks, this is likely to further injure DealDash's goodwill.

Besides injury to business reputation and goodwill, Wish's infringement of the DealDash mark is causing direct economic harm.  Since Wish began using the knockoff "Deal Dash" mark in 2015, DealDash's average cost to acquire a new paying customer has increased by more than 30%.  Wessman Decl., ¶ 6.  Given that the infringing Wish app comes back as a search result for "DealDash," and displays the counterfeit "Welcome to Deal Dash" to divert customers looking for the real DealDash app, it is reasonable to infer that Wish's infringement is directly responsible for this loss of business.  Moreover, the harm caused by this loss of business is difficult to quantify because a high percentage of DealDash's sales are based on repeat customers.  *Id*., ¶ 8.  Loss of each customer therefore has a magnified economic effect.

## III.   THE BALANCE OF EQUITIES FAVORS DEALDASH

As just discussed, DealDash faces the likelihood of irreparable harm without an injunction.  In contrast, an injunction will cause no cognizable harm to Wish because it has no right to use its counterfeit mark in the first place.  *Go Daddy*, 2018 WL 1091257, at *13 ("Defendants cannot claim any hardship from an injunction that would prevent them from using GoDaddy's trademarks, especially considering they have no current right to do so . . . ."); *2Die4Kourt*, 692 Fed. Appx. at 369 ("[W]hen the harm complained of results from a defendant's allegedly infringing conduct, we have nonetheless approved the entry of a preliminary injunction.").  The balance of equities therefore tips sharply in favor of DealDash.

## IV.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

"Public policy favors granting an injunction when there is a likelihood of consumer confusion." *Merscorp*, 2016 WL 5109969, at *4; *see also Maxim*, 654 F. Supp. 2d at 1036 ("In the trademark context,

courts often define the public interest as the right of the public not to be deceived or confused.").  As shown above, the public is already being confused by Wish's counterfeit mark, and further confusion is likely without an injunction.  An injunction is therefore in the public interest.

## V.    SCOPE OF THE INJUNCTION

The purpose of a preliminary injunction is to preserve the *status quo ante litem* until the Court can render final judgment on the merits.  *See Go Daddy,* 2018 WL 1091257, at *12.  In a trademark infringement case, that is the status before the defendant began using its infringing mark.  *See GoTo.com*, 202 F.3d at 1210.

In this case, Wish used its counterfeit mark to promote and distribute the Wish app, inducing millions of customers to download the app and to use it—as opposed to DealDash or other options—to purchase goods.  That app, with its infringing counterfeit mark, presumably remains on many of those consumers' devices to this day.  This is significant because if Wish's business is anything like DealDash's business (and it is), it relies heavily on repeat customers.  Even if some customers eventually figure out that Wish is unrelated to DealDash, some portion of those customers likely downloaded the Wish app in the first place based on initial interest confusion.  *Cf. Brookfield,* 174 F.3d at 1062 ("[T]he use of another's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement." (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997)) (internal quotation marks omitted)).

For these reasons, at a minimum, an injunction should require Wish to stop all use of its counterfeit "Deal Dash" mark, or any similar mark.  That alone, however, will not restore the *status quo ante litem*, because before Wish began using its infringing mark nobody had yet downloaded the Wish app based on initial interest confusion.  The injunction should therefore also bar Wish from taking orders from any Wish app that was originally downloaded with the counterfeit mark.  *Cf. D.light Design, Inc. v. Boxin Solar Co*., No. 13-5988, 2014 WL 11397885, at *3–*4 (N.D. Cal. Apr. 4, 2014) (ordering defendants and third parties to disable websites selling defendants' infringing products).  Anything short of this would allow Wish to continue to reap the benefits of infringement and initial interest confusion throughout the course of this litigation.

# CONCLUSION

For these reasons, DealDash respectfully requests that the Court enter a preliminary injunction barring Wish from using its counterfeit "Deal Dash" mark, or any colorably similar mark, pending a full hearing on the merits.

Date:  April 20, 2018                    Respectfully submitted,


_____
Patrick M. Shields
Matthew S. Warren
Erika H. Warren
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
18-2353@cases.warrenlex.com

*Attorneys for Plaintiffs DealDash Oyj and Deal Dash Inc.*

DEALDASH'S MOTION FOR PRELIMINARY INJUNCTION