United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEALDASH OYJ, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CONTEXTLOGIC INC.,<br><br>    Defendant. | Case No. 18-cv-02353-MMC<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 9 |

Before the Court is plaintiffs DealDash Oyj and DealDash, Inc.'s "Motion for Preliminary Injunction," filed April 23, 2018. On June 12, 2018, defendant ContextLogic, Inc. d/b/a Wish filed opposition, to which plaintiffs, on June 26, 2018, replied. Thereafter, the Court afforded defendant an opportunity to submit a sur-reply, which, on July 17, 2018, was filed. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

## BACKGROUND[2]

Plaintiffs own and operate the "penny auction" platform "DealDash," which is "available on the Internet and mobile applications," and enables users to bid on various consumer products. (See Mot. at 3:12-13 (citing How it works, DealDash, https://dealdash.com/help/how-it-works).)[3] In 2010, plaintiffs began using the "DealDash"

---

[1] By order filed August 3, 2018, the Court took the matter under submission.

[2] The following facts are undisputed.

[3] In a "penny auction," the "price of each item starts at just one cent, and rises by one cent with each additional bid." (See id.)

1    trade name, and, on February 1, 2011, registered the "DealDash" mark with the United
2    States Patent and Trademark Office.  (See Wolfram Decl., filed April 23, 2018, ¶ 3.)

3          Defendant owns and operates "Wish," an "online shopping platform and mobile application" (see Fahmy Decl., filed June 12, 2018 ("Fahmy Decl. I") ¶ 2) that enables users to "purchase merchandise from merchants at very low prices by bypassing the middleman" (see Chung Decl., filed June 12, 2018, ¶ 2).  Between November 2014 and August 2015, defendant "developed . . . four Sister mobile apps and websites," namely, "Cute," "Home," "Geek," and "Mama" (collectively, "Sister apps" and "Sister websites"), which "focus on specific product niches . . . that are subsets of products also available" on the Wish app and website.  (See Fahmy Decl., filed July 17, 2018 ("Fahmy Decl. II") ¶ 3-4.)

      "[A]round October of 2015," defendant added a "timed feed" on its Wish and Sister apps and websites, which feed displayed "several items available for a significant discount within a limited window."  (See Fahmy Decl. I ¶ 12.)  The feature was called "Deal Dash."  (See id.)  "[A]round the end of March 2016," defendant released the "Deal Dash" feature in its "final iteration," i.e., as a "daily deal wheel feature," wherein users may "click to 'spin' a wheel" to unlock a "number of items (dictated by the user's 'spin') . . . at very deep discounts."  (See id. ¶ 14.)

      Based thereon, plaintiffs, on April 18, 2018, filed the instant action, wherein plaintiffs assert, inter alia, a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114.

      The following week, plaintiffs, on April 23, 2018, filed the instant motion, by which plaintiffs, based on their trademark infringement claim, seek various forms of injunctive relief.  That same date, plaintiffs served on defendant the summons, complaint, and instant motion.  (See Dkt. No. 11 (Certificate of Service).)

      Prior to April 23, 2018, defendant was unaware of plaintiffs' objection to defendant's use of "Deal Dash."  (See Chuang Decl., filed June 12, 2018, ¶ 7; Fahmy Decl. I ¶ 16.)  Thereafter, defendant took a number of steps to cease its use of the "Deal

1  Dash" mark.  Specifically, by May 1, 2018, defendant had replaced "all references to
2  'Deal Dash'" with "Blitz Buy" on its Wish and Sister websites.  (See Fahmy Decl. I ¶ 20;
3  Fahmy Decl. II ¶ 8).  Additionally, by May 24, 2018, defendant had: (1) removed from
4  circulation "all advertisements . . . that mentioned the Deal Dash feature" (see Kathiresan
5  Decl., filed June 12, 2018 ("Kathiresan Decl. I") ¶ 2); (2) replaced "Deal Dash" with "Blitz
6  Buy" in "all areas" of the Wish and Sister apps that defendant "could modify on users'
7  devices by making changes through [defendant's] servers" (see Fahmy Decl. I ¶ 21;
8  Fahmy Decl. II ¶ 10); and (3) "released" updates, for all versions of the Wish and Sister
9  apps, which updates "addressed any residual references to 'Deal Dash'" (see Fahmy
10  Decl. I ¶ 23; Fahmy Decl. II ¶ 10).

In light of the above, defendant contends the instant motion is "essentially moot." (See Opp. at 1:10.)  Plaintiffs continue to seek various forms of injunctive relief.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. Alternatively, under the "sliding scale test," a preliminary injunction is appropriate where the plaintiff establishes that "serious questions going to the merits" exist, that "there is a likelihood of irreparable injury" in the absence of injunctive relief, that "the balance of hardships tips sharply in [his] favor," and that "the injunction is in the public interest."  See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

**DISCUSSION**

The Court next addresses in turn each form of injunctive relief requested.[4]

---

[4] The Court considers plaintiffs' request for an injunction prohibiting defendant from "[u]sing in commerce [p]laintiffs' registered 'DealDash' service mark, the counterfeit 'Deal Dash' mark, or any other confusingly similar variation of [p]laintiffs' mark" (see id. at 1:18-19) to be coextensive with the more specific forms of relief discussed below.

3

### A. Use in Advertising, Marketing, Distribution, or Publishing

Plaintiffs seek an injunction prohibiting defendant from "[a]dvertising, marketing, distributing, or publishing the Wish app or any other app, webpage, or electronic media bearing the 'DealDash' mark, the counterfeit 'Deal Dash' mark, or any other confusingly similar variation of the 'DealDash' mark." (See Proposed Order at 1:22-24.) In support of its request for the above-referenced relief, plaintiffs, who acknowledge defendant's removal of all mention of "Deal Dash" from its websites and advertisements, as well as from all updated versions of its apps, contend that, "without an injunction [defendant] could resume those uses (or find new ones) at any time." (See Reply at 3:17-18.)

Although "a defendant cannot automatically moot a [need for injunctive relief] simply by ending its unlawful conduct once sued," such cessation eliminates the threat of irreparable harm where it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." See Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013). Here, defendant has not only ceased its use of the "Deal Dash" mark, but has adopted a new name, "Blitz Buy," for its daily deal wheel feature and replaced all mention of "Deal Dash" with "Blitz Buy" on its websites, in its advertisements, and in the updated versions of its apps. Additionally, defendant has submitted unchallenged evidence that its "Blitz Buy" feature is performing at least as well as, if not better than, it did under the "Deal Dash" name. (See Fahmy Decl. I ¶ 26 & Exs. C, D (showing "Add to Cart" data from April 1, 2018 through June 67, 2018).) In light of the above-referenced evidence, it cannot "reasonably be expected" that defendant will again use the "Deal Dash" mark.

Accordingly, plaintiff's request for the above-referenced relief will be denied.

### B. Use as Search Keywords

Plaintiffs also seek to enjoin defendant from "[u]sing 'DealDash,' 'Deal Dash,' or any other confusingly similar variation of the 'DealDash' mark as a search keyword on the Internet or in app stores." (See Proposed Order at 1:20-21.)

First, relying on defendant's opposition, wherein defendant argues such use does not constitute infringement (see, e.g., Opp. at 21:9-24), plaintiffs contend defendant

"concedes that it continues to use the DealDash mark as a search term" (see Reply 1:23). Defendant, however, in support of its sur-reply, has submitted a declaration from Krishanth Kathiresan ("Kathiresan"), its User Acquisition Manager, who is "responsible for overseeing" defendant's "web advertising" and "mobile app install advertising campaigns" (Kathiresan Decl., filed July 17, 2018 ("Kathiresan Decl. II") ¶¶ 1-2), in which Kathiresan avers defendant "currently does not use the term 'DealDash' or 'Deal Dash' as a search advertising keyword" (see id. ¶ 4). In particular, Kathiresan states that although defendant, in some of its past online advertising campaigns, included "Deal Dash" as a search keyword, it no longer does so. Indeed, as of July 9, 2018, upon defendant's request, "Deal Dash" and "DealDash" have both been included as "negative keywords across all" defendant's Google AdWords campaigns (see id. ¶ 14), which setting "will prevent [defendant's] ads from being returned at all from a search for those terms" (see id. ¶ 12).

As discussed above, the Court acknowledges that mere cessation of "unlawful conduct" does not "automatically moot" the need for injunctive relief; rather, it must be "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." See Nike, 568 U.S. at 91. Here, however, defendant has offered unchallenged evidence showing not only that it has included "Deal Dash" and "DealDash" as "negative keywords," but that its past use of the "Deal Dash" term "would have occurred only if Google's own algorithm had included [it] . . . or if Google had suggested" the term to defendant (see Kathiresan Decl. II ¶ 11); the term "was not sought out" by defendant (see id. ¶ 8). In light of the above, even assuming defendant's past use amounted to infringement, defendant has clearly shown it cannot "reasonably be expected" to use "Deal Dash" or "DealDash" as Internet search keywords in the future.

As noted, plaintiffs also contend defendant uses the above-referenced marks as search keywords in app stores. In support thereof, plaintiffs have submitted screenshots from the Apple iOS and Google Android app stores showing that defendant's apps, specifically the Wish and Geek apps, appear among the search results for the terms

"DealDash" and "Deal Dash." (See Warren Decl., filed June 26, 2018, ¶¶ 29, 30 & Exs. 84, 85.)[5] As also noted, however, Kathiresan, in his declaration, avers defendant "does not use the term 'DealDash' or 'Deal Dash' as a search advertising keyword" (see Kathiresan Decl. II ¶ 4), and, as defendant points out, the results for defendant's apps, as shown in plaintiffs' exhibits, do not include an "Ad" icon, which is displayed when a result is generated by way of the app's "own search advertising" (see id. ¶¶ 16-17; see also Hwang Decl., filed July 17, 2018, ¶ 3 (showing Apple iOS app store search results for "dealdash"; further showing "Overstock.com" app with "Ad" icon)). The inclusion of defendant's apps in the search results, Kathiresan avers, is due to "Apple's or Google's proprietary algorithm," which determines "what apps appear in the app store search results and how they are ranked among the search results." (See Kathiresan Decl. II ¶ 15.) Given such unchallenged evidence, plaintiffs have failed to show defendant is currently, or will in the future, use "DealDash," or any confusingly similar variation thereon, as a search keyword in the app stores.

In sum, plaintiffs have failed to show they will suffer irreparable harm in the absence of the requested relief. See Winter, 555 U.S. at 24 (holding plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original).

Accordingly, plaintiffs' request for the above-referenced relief will be denied.

**C. Taking or Fulfilling Orders from Applications that Displayed the "Deal Dash" Mark when Originally Downloaded**

Next, plaintiffs seek an injunction prohibiting defendant from "[t]aking or fulfilling

---

[5] Defendant's objection to Exhibit 84 on the ground that it does not state the date on which the search results pictured therein were generated, and thus is not "properly authenticated under Fed. R. Evid. 901 and 902" (see Objections to Reply Evidence and Administrative Motion at 3:9-10), is overruled. Even assuming inadmissibility under the Federal Rules of Evidence, such rules "do not apply strictly to preliminary injunction proceedings." See Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1250 (9th Cir. 2013). Rather, a lack of authentication "properly go[es] to weight rather than admissibility." See Go Daddy Operating Co., LLC v. Ghaznavi, No. 17-CV-06545, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018).

orders from any Wish app or other app that included the counterfeit 'Deal Dash' mark when it was originally downloaded." (See Proposed Order at 1:27-28.)

As discussed above, a plaintiff seeking a preliminary injunction must show "he is likely to suffer irreparable harm in the absence" of the relief requested. See Winter, 555 U.S. at 20. To make such showing, the plaintiff must demonstrate both that a "'sufficiently strong causal nexus'" exists between the conduct sought to be enjoined and the claimed harm, see Open Text, S.A. v. Box, Inc., 36 F. Supp. 3d 885, 904 (N.D. Cal. 2014) (quoting Apple, Inc. v. Samsung Electronics Co., Ltd., 678 F.3d 1314, 1324 (Fed. Cir. 2012)), and that "remedies available at law, such as monetary damages, are inadequate," see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

Here, although plaintiffs do not clearly identify the irreparable harm they will suffer in the absence of the above-referenced relief, it would appear plaintiffs are relying on a loss of market share, given their argument that defendant "should not be permitted to benefit" from customers it obtained while using the "Deal Dash" mark. (See Reply at 3:11-12.) In any event, plaintiffs' showing is insufficient.[6]

First, the only evidence plaintiffs have offered is that, since 2015, the year defendant began using the "Deal Dash" mark, plaintiffs' "average cost to acquire a new customer [has] increased by more than 30%." (See Wessman Decl., filed April 23, 2018, ¶ 6.) Such increased marketing costs are not, however, sufficient to show plaintiffs' share of the market has decreased. Moreover, as defendant points out in its opposition, and plaintiffs do not address in their reply, plaintiffs have not provided evidence showing any such increase in cost was caused by defendant's use of the "Deal Dash" mark. See Open Text, 36 F. Supp. 3d at 907 (denying motion for preliminary injunction in patent

---

[6] Although plaintiffs contend they will suffer "loss of control over [their] business reputation, and loss of goodwill" if defendant "continues to take orders from consumers who have un-updated apps" (see Reply at 13:23-14:3), plaintiffs make such contention in connection with a separate request for relief, which the Court discusses below.

7

infringement case where plaintiff failed to show "lost sales would not be lost but for the offending feature in the accused product").

Further, as defendant points out in its opposition, and plaintiffs do not address in their reply, plaintiffs do not contend, let alone cite to any evidence to suggest, monetary relief is an inadequate remedy. Plaintiffs thus have failed to show "remedies available at law . . . are inadequate, see eBay, 547 U.S. at 391; see also Open Text, 36 F. Supp. 3d at 907-08 (holding "[n]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, without more, warrants a finding of irreparable harm and the issuance of a preliminary injunction") (internal quotation and citation omitted), and, consequently, have failed to show they are "likely to suffer irreparable harm" absent the relief requested, see Winter, 555 U.S. at 20.

Even assuming plaintiffs had made an adequate showing as to irreparable harm, however, plaintiff has failed to show "the balance of equities tips in his favor." See id. at 24. In particular, defendant has submitted unchallenged evidence that the above-referenced injunction would prohibit defendant from taking orders from "about 90% of all of [its] current user base, or hundreds of millions of accounts" (see Xie Decl., filed June 12, 2018, ¶ 18), which would "have a devastating impact on [its] image . . . , as well as to [its] merchant relationships" (see Chuang Decl., filed June 12, 2018, ¶ 16 (stating, "earlier this year," defendant "had to shut down [its] Wish® app in Sweden due to . . . high rates of [Value-Added Tax]," which shutdown "adversely affected [its] merchant relationships" even though "Sweden made up a very small portion of [its] transactions")).

In light of such evidence, plaintiffs have failed to show the balance of equities tips in their favor. See Wild v. HarperCollins Publishers LLC, No. 12-CV-01191, 2013 WL 12137684, at *3 (C.D. Cal. Jan. 2, 2013) (finding plaintiff failed to show "balance of hardships" tipped in its favor where plaintiff had not shown likelihood of irreparable harm and defendant offered evidence that "injunction preventing marketing and distribution" of infringing books would "reduce sales for book retailers, and [might] . . . erode [defendant's] ability to obtain shelf space at bookstores for future novels") (alteration in

original) (internal quotation and citation omitted).

Accordingly, plaintiffs' request for the above-referenced relief will be denied.

**D.      Taking or Fulfilling Orders from Applications that Currently Display the "Deal Dash" Mark**

Plaintiffs additionally seek an injunction prohibiting defendant from "[t]aking or fulfilling orders from any . . . app that displays the 'DealDash' mark, the counterfeit 'Deal Dash' mark, or any other confusingly similar variation of the 'DealDash' mark." (See Proposed order at 1:24:26.)

Although defendant has "released" updates for all versions of its apps to "address[] any residual references to 'Deal Dash'" (see Fahmy Decl. I ¶ 23; Fahmy Decl. II ¶ 10)), around 10% of defendant's "active" users have not yet updated their apps (see Fahmy Decl. II ¶ 12 (stating "more than 90%" of users who have been "active" since June 1, 2018, "have the new mobile app version that replaced all references to 'Deal Dash' with 'Blitz Buy'")). Plaintiffs, relying on twelve misdirected "consumer complaints" (see Reply at 13:19 (citing Lee Decl., filed April 23, 2018, Exs. 10-21)), contend they are likely to suffer "loss of control over [their] business reputation, and loss of goodwill" if defendant "continues to take orders from consumers who have un-updated apps" (see Reply at 13:23-14:3).

As defendant points out in its opposition, however, because "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged, [a]n overbroad injunction is an abuse of discretion." See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotations and citations omitted). Here, although "loss of control over business reputation and damage to goodwill could constitute irreparable harm," see Herb, 736 F.3d at 1250, the requested relief is not sufficiently tailored to prevent such harm, see Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1049 (9th Cir. 2013) (holding "[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the court"). In particular, plaintiff received all of the above-referenced "consumer complaints" before defendant removed the "Deal

1    Dash" mark from its advertisements, websites, updated apps, and all areas of its
2    un-updated apps except the daily deal feature itself.  (See Lee Decl., filed April 23, 2018,
3    Exs. 10-21; see also Fahmy Decl. I ¶ 21 (showing "areas" of apps in which defendant
4    could not unilaterally replace "Deal Dash" with "Blitz Buy").)
5            As a result of defendant's remedial measures, any remaining threat to plaintiffs'
6    reputation and goodwill is confined to situations in which users place orders in connection
7    with the daily deal wheel feature, which, according to defendant's unchallenged evidence,
8    is responsible for less than 3% of the items added by app users to their virtual carts.
9    (See id. ¶ 25 & Exs. C, D (showing "Add to Cart" data).)  Under such circumstances, the
10   requested injunction prohibiting defendant from taking any orders placed using an
11   un-updated app, regardless of whether the orders were placed in connection with the
12   daily deal wheel feature, is overbroad, in that it extends well beyond that needed to
13   remedy the harm shown.  See Columbia Pictures, 710 F.3d at 1049.
14           Accordingly, plaintiff's request for the above-referenced relief will be denied.

**E.     Mandatory Update**

Lastly, plaintiffs seek an injunction "requiring defendant to issue a mandatory update for previously distributed apps still bearing the counterfeit mark."  (See Reply at 14:12-13; see also Proposed Order at 2:2-3 (seeking injunction requiring defendant to "update all apps downloaded by customers prior to the date of [the instant order] to remove the counterfeit 'Deal Dash' mark").)

Such requested relief would not "simply preserve the status quo," but would require defendant to "take action," and thus amounts to a mandatory injunction.  See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation and citation omitted); see also id. (finding, in action for trademark infringement, preliminary injunction requiring recall of infringing products "no longer within [defendant's] possession" was mandatory injunction).  Indeed, in support of its sur-reply, defendant has submitted a declaration from Tarek Fahmy, its "[Vice President] of Engineering, Product," in which he states such update would require

1 defendant to not only "stop all API (application programming interface) calls to the native
2 code of the outdated version of the mobile apps," but "display a pop-up message telling
3 users that they need to update their mobile app in order to continue using the app." (See
4 Fahmy Decl. II ¶ 14); see e.g., Plumbing v. Belodedov, No. 17-CV-02545, 2018 WL
5 888965, at *2 (E.D. Cal. Feb. 14, 2018) (characterizing requested preliminary injunction
6 as mandatory where plaintiffs sought order requiring defendants to "remove what
7 [p]laintiffs allege[d] [were] fake negative online reviews of [plaintiffs'] business").

8     Mandatory injunctions are "particularly disfavored," and should only be granted
9 upon a showing that "extreme or very serious damage will result" in the absence of the
10 requested relief. See Marlyn, 571 F.3d at 879 (internal quotation and citation omitted).
11 Here, plaintiffs cite to the above-referenced twelve "consumer complaints" as evidence
12 that, absent the mandatory update, plaintiffs will suffer harm to their business reputation
13 and goodwill. (See Reply at 13:19 (citing Lee Decl., filed April 23, 2018, Exs. 10-21).) As
14 noted above, however, those communications pre-date defendant's remedial measures,
15 and defendant has offered unchallenged evidence that "more than 90%" of its active
16 users have installed updated apps (see Fahmy Decl. II ¶ 12), as well as unchallenged
17 evidence that less than 3% of all orders placed on defendant's apps are placed in
18 connection with the sole area of the un-updated apps that still displays the "Deal Dash"
19 mark (see Fahmy Decl. I ¶¶ 21, 25). In light of the above, plaintiffs have failed to show
20 they will suffer "extreme or very serious damage" absent the requested mandatory
21 update. See Marlyn, 571 F.3d at 879.

22     Moreover, for the reasons set forth in the previous section, the requested relief is
23 "more burdensome to . . . defendant than necessary" to avert the harm plaintiffs claim,
24 and thus is overbroad. See Columbia Pictures, 710 F.3d at 1049.

25     Accordingly, plaintiffs' request for the above-referenced relief will be denied.
26 *//*
27 *//*
28 *//*

11

## CONCLUSION

For the reasons set forth above, plaintiffs' motion is hereby DENIED.

**IT IS SO ORDERED**

Dated: August 10, 2018

MAXINE M. CHESNEY
United States District Judge